**TRANS WORLD AIRLINES, INC., Plaintiff,**

v.

**SUMMA CORPORATION and William R. Lummis, Delaware Ancillary Administrator of the Estate of Howard R. Hughes, Defendants.**

**Civ. A. No. 1607.**

Court of Chancery of Delaware, New Castle.

Submitted Dec. 9, 1976.

Decided March 25, 1977.

On Motion For Reargument

Submitted April 25, 1977.

Decided May 10, 1977.

---

**6**

James M. Tunnell, Jr., and Martin P. Tully of Morris, Nichols, Arsht & Tunnell, Wilmington, and Maxwell E. Cox of Davis & Cox, New York City, for defendants.

MARVEL, Chancellor.

This action for an accounting of damages allegedly sustained by a corporate subsidiary as the result of actions of its parent and such parent's sole stockholder, taken in alleged breach of the rights of plaintiff's minority stockholders, was filed in 1962 by plaintiff Trans World Airlines, Inc., hereinafter referred to as TWA, against such parent, Hughes Tool Company, hereinafter referred to as Toolco,[1] and the late Howard R. Hughes, Toolco's sole stockholder. However, after the disposal of preliminary motions, proceedings in Delaware were informally held in abeyance for many years while the parties litigated the basic matters in issue in a companion case based on the theory that defendants' alleged breaches of fiduciary duty to plaintiff constituted violations of federal anti-trust laws, which federal action was ultimately resolved in favor of the defendants by the Supreme Court of the United States on the ground that the Civil Aeronautics Board has approved the transactions complained of by plaintiff thus allegedly granting them immunity from attack in this Court. TWA thereupon took steps to revive the present action,[2] relying on principles of Delaware corporate law having to do with the common law duties of corporate fiduciaries. The opposing parties have filed cross motions for summary judgment on the basis of the present record and this is the opinion of the Court on such motions. While the companion federal case was concerned with substantially the same subject matter as that involved here, such case, as noted above, was ultimately decided on the narrow ground of Civil Aeronautics

Louis J. Finger of Richards, Layton & Finger, Wilmington and Dudley B. Tenney of Cahill, Gordon & Reindel, New York City, for plaintiff.

1. Now Summa Corporation.

2. In 1973 the Supreme Court of the United States reversed a default judgment which had been entered by the United States District Court for the Southern District of New York, an order which had earlier been affirmed by the

Court of Appeals for the Second Circuit, *Trans World Airlines, Inc. v. Hughes Tool Co.*, 308 F.Supp. 679 (S.D.N.Y.1969), aff'd, 449 F.2d 51 (2nd Cir. 1971), rev'd, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577, reh. den., 410 U.S. 975, 93 S.Ct. 1435, 35 L.Ed.2d 707 (1973).

Board approval of actions of the defendants affecting plaintiff, and the final order therein is allegedly not dispositive of this present action which is based on alleged breaches of Delaware fiduciary law on the part of a majority stockholder.

At the time the complaint herein was filed, Hughes was the owner of all of the outstanding stock of Toolco, which, in turn, was the owner of 78% of the outstanding stock of TWA. Accordingly, Hughes and his wholly owned corporation, Toolco, had been able to carry out their judgments as to how and when TWA would enter the developing area of commercial jet aircraft transportation as well as how and when such acquisitions should be financed without effective opposition.

About the time that a joint development project which had for several years been carried on by Toolco and the Convair Division of General Dynamics Corporation having to do with the design of an efficient jet aircraft (a project in which Toolco engineers participated) was abandoned in 1955, a number of the leading domestic and foreign air carriers, including TWA's major competitors, had placed orders for jet aircraft with the Boeing Company as well as with the Douglas Aircraft Company for delivery in 1959 and 1960. Concerned by the placing of such orders by competitors of TWA, orders were then issued for the acquisition by Toolco of thirty-three jet powered aircraft from Boeing as well as thirty jets from Convair, in the negotiations for which TWA was not permitted to participate. As of February, 1959, agreement on the financing of such purchases had not been arranged, and because of failure to reach agreement on a financing arrangement acceptable to both Toolco and Hughes as well as the lending institutions, the defendants sought and obtained approval from the Civil Aeronautics Board of an emergency plan under the terms of which defendants were permitted to acquire and lease needed jet aircraft to TWA on a day

to day basis. Thereafter, Hughes reduced the number of jets to be purchased for TWA's benefit to twenty-five Boeings and twenty Convairs. By late spring of 1959, an acceptable financing agreement had still not been reached, and with the necessity of paying for a number of jet aircraft, the delivery of which was imminent, Hughes and Toolco arranged for the sale on June 10, 1959 of six long range Boeing 707-331 jet aircraft to Pan American, TWA's principal transatlantic competitor. In November of 1960, defendants further contracted to lease six jets which had been ordered from Convair to Northeast Airlines. However, financing of the purchase of jet aircraft for the purported benefit of TWA having been at long last arranged, under a plan which was acceptable to the various financing institutions involved, requiring, inter alia, that the TWA stock held by Toolco be placed in a voting trust, Toolco's dominant position in the affairs of TWA was terminated. Moreover, notwithstanding the transfers to Pan American and Northeast of jet aircraft, as noted above, TWA ultimately acquired the use of all of the jet aircraft which had been ordered for it by Hughes and Toolco and jet service was instituted by TWA in 1959, which service thereafter produced earnings totaling approximately 25% of its domestic revenue calculated on the basis of total passenger miles flown.

TWA now argues that the conduct of Hughes and Toolco vis à vis TWA concerning such aircraft acquisitions constituted a breach of fiduciary duty owed by them to TWA and its minority shareholders,[3] TWA contending that the defendants having prevented TWA from obtaining timely and adequate financing for the acquisition of jet aircraft and thus having been prevented from purchasing and receiving delivery of an adequate number of such aircraft in its own name and on a timely basis, that it is entitled to an accounting of damages. It is also contended that the sale and lease of jets by Toolco to other airlines in competi-

---

3. Defendants have admitted the factual allegations of the complaint, as amended, with the exception of claims for damages and those allegations characterized as contradicted by TWA's own admissions.

tion with TWA constituted a violation of the fiduciary duty owed by both Toolco and Hughes to TWA.

TWA now seeks an accounting for the damages allegedly sustained by it as a result of defendants' acts which prevented TWA from acquiring its own jet aircraft, for the profits thereby gained by the defendants, and finally for damages allegedly suffered by TWA as the result of the selling or leasing of jet aircraft by defendants to other airlines. Total damages thus allegedly sustained by TWA are claimed to exceed $35,000,000. Significantly, the special master appointed in the federal litigation, in which a default judgment was entered, found that TWA had sustained damages in excess of $40,000,000 as a result of defendants' acts, *Trans World Airlines, Inc. v. Hughes*, 308 F.Supp. 679 (S.D.N.Y.1969).

TWA argues that the actions of Toolco and Hughes of which it complains were motivated in large part by a purpose on their part to evade income taxes which would otherwise have been assessed against Hughes on dividends paid to him as sole stockholder out of the income realized by Toolco in its other operations or against Toolco as the result of the assessment of an accumulated earnings tax based on an improper accumulation of income. As a result a plan was devised to provide for the allocation of accumulated Toolco earnings to the purchase of aircraft to be owned by Toolco but flown by TWA, Toolco being thus accorded the added tax advantage of accelerated depreciation on such aircraft.

Defendants' response to these charges is found in two basic contentions. They assert that TWA is not entitled to an accounting because this is not a case of self-dealing but rather of self-interest in that the parent obtained no benefit which worked to the detriment of TWA's minority shareholders, and secondly that the transactions on which TWA bases its claim for damages were approved as just and reasonable and in the public interest by the Civil Aeronautics Board in the exercise of jurisdiction vested in it by the Congress of the United States.

■ In dealings between a parent and its subsidiary in a situation in which the parent has controlled the transaction in issue and has fixed its terms, a test of whether or not such transaction was intrinsically fair to the subsidiary is normally applied when such a transaction is reviewed in the courts of Delaware, *Getty Oil Co. v. Skelly Oil Co.*, Del.Supr., 267 A.2d 883 (1970) and *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717 (1971). Application of the intrinsic fairness test also requires that the parent corporation bear the burden of establishing the entire fairness of a transaction under attack, *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107, 110 (1952).

■ On the other hand, the so-called business judgment rule will be applied in situations in which the terms of a transaction are not imposed by the parent corporation but by a third party, such as a state or federal agency, *Getty Oil Company v. Skelly Oil Co.*, supra. In such a case courts will not interfere with a transaction unless there is a showing of gross and palpable overreaching, *Meyerson v. El Paso Natural Gas Company*, Del.Ch., 246 A.2d 789, 794 (1967). Here, I am satisfied that under the material facts of record that the issue to be decided is whether or not the admitted facts of record present a case of self-dealing sufficient to call into play the intrinsic fairness rule, namely whether or not Hughes and Toolco caused TWA to act in such a way that as a result defendants derived benefits in which the minority stockholders of TWA were denied the right to participate, *Sinclair Oil Corp. v. Levien*, supra.

■ First of all, I am satisfied that the mere fact that Toolco engaged in the acquisition, financing, leasing, and ultimately in the sale of jet aircraft is not, in itself, of significance in this case because a parent company may concern itself with the purchase and sale of equipment to be used by a subsidiary, the basic question being rather whether or not TWA suffered injury by reason of being barred from dealing in such area on its own.

■ I conclude that the basic prerequisites to the application of the intrinsic fairness rule (*Sinclair Oil Corp. v. Levien*, supra) are found in the instant case. First of all, it is conceded that Toolco and Hughes exercised control over the affairs of TWA during the period in question, particularly in the area of the financing and acquisition of jet aircraft,[4] the policy for which over a substantial period was dictated by the defendants, jet aircraft having been leased by Toolco to TWA on a day to day basis prior to agreement on a satisfactory financing arrangement. Furthermore, while Toolco ultimately turned over to TWA the jet aircraft in question once a financing plan was agreed upon, there is no doubt but that the defendants bargained on both sides of such transactions, causing TWA to act in such a way as to cause defendants to derive advantages at the expense of TWA to the exclusion of and to the detriment of the latter's minority shareholders. Accordingly, by refusing to allow TWA to select and finance the purchase of its own jet aircraft, the defendants were in a position to mete out to TWA such jet aircraft as they chose. In other words, by preventing TWA from making its own arrangements for the acquisition of jet planes, the defendants retained the capability of arranging the terms of such acquisitions so as to benefit themselves. In addition, in the event of the development of problems in connection with such acquisitions, as ultimately came to pass, in the task of obtaining long term financing for TWA, the defendants remained free to dispose of such aircraft to other air carriers.

Thus, it is clear on the present record that the minority shareholders of TWA received nothing in exchange for the strictures imposed by defendants on plaintiff's operations and that such stockholders may have suffered injury as a result of the loss of TWA's freedom to compete. As charged

in the complaint, TWA might well have been able to earn substantially more income for its minority as well as majority stockholders through increased business activity during the period of its being dominated had it not been subject to the strictures imposed by the defendants. Accordingly, TWA is entitled to an accounting on the issue of jet plane acquisitions by defendants unless the federal judgment on such issue forestalls such right in whole or in part.

■ A second claim made by TWA is that Toolco must be required to account to TWA for damages resulting from the sale or lease of jets by Toolco to airlines other than TWA prior to the making of arrangements for a permanent financing plan for the purchase of jet planes for TWA's use. However, plaintiff, in my opinion, has on the present record failed to establish how Toolco acquired something from TWA to the detriment of TWA's minority shareholders in connection with such transactions. There is no evidentiary basis, therefore, on the present record, for a finding of self-dealing in connection with the sale and lease of aircraft by defendants to other airlines.

■ Defendants contend that notwithstanding the foregoing insofar as TWA's basic contentions are concerned that all of TWA's other claims must be dismissed on the ground that the actions for which TWA seeks an accounting for damages were approved by the CAB, thus being immunized from any liability for such actions by the provisions of section 414 of the Federal Aviation Act, 49 U.S.C. sec. 1301 et seq, which relieves any person affected by an order under section 408 of such act from the operation of all legal restraints and prohibitions insofar as may be necessary to enable such person to do anything authorized by such an order.[5]

---

**4.** Paragraph 9 of the complaint, as amended, alleges that throughout the period from 1950 through 1960, the defendants ignored the claimed right of plaintiff to select and purchase its own jet aircraft. The answers, as amended, of the defendants admit such allegation.

**5.** Section 414 provides:

"Any person affected by any order made under sections 1378, 1379 or 1382 of this title shall be, and is hereby, relieved from the operations of the 'antitrust laws', as designated in section 12 of title 15, and of all other restraints or prohibitions made by, or imposed under,

The Civil Aeronautics Board issued a number of orders under section 408 of the act which are concerned with the matters here in litigation beginning in 1944 when such an order approved Toolco's proposal to expand its ownership of stock of TWA.[6] The first such order approved control by Toolco of approximately 45.6% of the outstanding stock of TWA,[7] such order being later modified to allow acquisition of up to 80% of TWA's outstanding shares.[8] Moreover, in approving such stock purchases, the CAB adopted the examiner's finding that " * * * [t]he continued interest of Toolco in TWA appears essential to the best interests of the carrier and the public".[9] Next, because of the restricted field in which transactions between Toolco and TWA were authorized, it was also necessary that Civil Aeronautics Board approval be obtained when it was determined that, due to the lack of permanent financing, aircraft must be leased to TWA on a day to day basis. Thus, the Board was asked and granted approval of each such request concerned with proposed leases of aircraft, lease extensions, and concomitant financing arrangements. In addition, the last order of the Civil Aeronautics Board here in issue, handed down on December 29, 1960, approved permanent plans for financing the acquisition of jet aircraft for TWA, including the voting trust which eliminated Toolco's control over TWA and resulted in the transfer of TWA's jet fleet to its own control. In granting each such approval, the Civil Aeronautics Board expressed the view that the proposed transaction was " * * * just and reasonable and in the public interest." [10]

In affirming this Court's refusal to dismiss the complaint in this case and rejecting the contention that a blanket immunity to the prosecution of the present claims is found in the provisions of Section 414 of the Federal Aviation Act, the Supreme Court of Delaware held:

"We must, and of course do, give deference to all that the CAB approves within the jurisdiction assigned to it by Congress. And we specifically refrain from any comment as to the significance of CAB approval of any specific transaction upon liability of the defendants. . . . We are concerned here only with defendants contention that a blanket immunity flows from § 414, no matter the circumstances. We decide that TWA may proceed with the litigation."

*Hughes v. Trans World Airlines, Inc.*, Del. Supr., 336 A.2d 572, 579 (1975),[11] aff'g, Del. Ch., 317 A.2d 114 (1974). Thus, while rejecting the contention that Civil Aeronautics Board approval conferred blanket immunity, the Court recognized that specific transactions approved by the Board were susceptible to being rendered immune from further attack on the basis of State fiduciary law by reason of the provisions of Section 414 of the act.

I conclude that the choice of an appropriate mode of inquiry as to whether or not section 414 furnishes immunity as to any specific transaction between plaintiff and defendants depends on whether or not application of a legal restraint or prohibition, such as that imposed by Delaware corporate fiduciary law, would militate against any action authorized, approved or required by a Board order. To require defendants to

authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order." 49 U.S.C. Sec. 1384 (1976).

6. Section 408 requires, inter alia, the approval of the Civil Aeronautics Board for certain acts and transactions occurring between air carriers, 49 U.S.C. Sec. 1378.

7. 6 CAB 153 (1944).

8. 12 CAB 192 (1950).

9. Id. at 222.

10. See e. g., Order No. E–13542 (Feb. 26, 1959); Order No. E–13873 (May 15, 1959); Order No. E–14169 (July 1, 1959); Order No. E–14504 (Sept. 30, 1959); Order No. E–14877 (Jan. 29, 1960); Order No. E–15430 (June 23, 1960); Order No. E–16195 (Dec. 29, 1960). In each case the CAB reserved the question of reasonableness for rate making purposes.

11. Cert. denied, *Summa Corp. v. Trans World Airlines*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 61 (1975).

account for profits realized in connection with transactions which were specifically approved by the Civil Aeronautics Board would be, in my opinion, to veto conduct specifically authorized by an agency of competent jurisdiction. To hold that such specifically approved transactions were not intrinsically fair would directly repudiate the Board's determination that such were " * * * just and reasonable and in the public interest." It is therefore concluded that an accounting for profits gained by the defendants in connection with the specific acts of leasing, lease extensions and transfers of aircraft from Toolco to TWA, which were approved by the Civil Aeronautics Board, will not be granted.

This does not, however, mean that plaintiff's claims in this Court not affected by orders of the Civil Aeronautics Board, specifically dealing with Toolco's policy of refusing to allow TWA to contract on its own behalf in the purchase of jet aircraft or of requiring TWA to obtain new aircraft only through Toolco are without merit. In short, the Civil Aeronautics Board orders in question approved only those specific transactions brought before the Board. And the fact that specific transactions were approved as just and reasonable from time to time does not mean that Toolco's overall policy of refusing to allow TWA to purchase aircraft when it needed them and from whom it desired to purchase them was at all times just and reasonable. Indeed, TWA may be able to demonstrate that it has sustained substantial damages by reason of its need for jet aircraft during the period in question and the fact that aircraft were later made available to it on fair terms does not necessarily mean that damages were not earlier sustained.

Defendants further argue that it is necessary that a transaction be shown to have taken place between a parent and a dominated subsidiary before the intrinsic fairness standard may be applied, apparently contending that a contractual relationship must be established. However, an actual contract is not necessarily a prerequisite to application of the intrinsic fairness test, *Sinclair Oil Corp. v. Levien*, supra, the Court noting in such case that a dividend declared by a subsidiary, when dictated by a controlling parent may be subjected to the intrinsic fairness rule in certain circumstances.

Next, the test as to control established in the case of *Sinclair Oil Corp. v. Levien*, supra is whether or not the parent corporation has caused the subsidiary to act in a manner so as to cause the parent to receive something from the subsidiary to the exclusion of and detriment to the minority stockholders of the subsidiary. Here Toolco is charged with causing TWA to refrain from purchasing aircraft so that Toolco would be able to make such purchases on its own and lease or sell them to TWA at a profit. In short, Toolco at all times here relevant controlled the market for the jet aircraft to be used by TWA, in which transactions the minority shareholders of TWA received no benefit. Moreover, harm may have resulted because of the unavailability of jet aircraft for TWA prior to the time Toolco made arrangements for the day to day leasing of such aircraft to TWA. Civil Aeronautics Board approval of a specific transaction does not, therefore, provide immunity for liability arising out of such unprotected conduct.

I conclude that the actions of Toolco and Hughes in restricting and controlling the corporate activities of TWA to their own advantage does not on the present record establish that the transactions complained of, other than those receiving specific Civil Aeronautics Board approval, were intrinsically fair to the minority stockholders of TWA, there having been no general approval by the Civil Aeronautics Board of the overall conduct of the defendants' vis à vis plaintiff. Accordingly, defendants will be required to account to TWA for the actual damages sustained by the latter as to those transactions which did not receive specific Civil Aeronautics Board approval.

Order on notice.

## ON MOTION FOR REARGUMENT

The defendant Summa Corporation has moved for reargument of this Court's opinion of March 25, 1977, which denied Toolco's motion for summary judgment and granted in part the cross motion of plaintiff for partial summary judgment.

The thrust of Toolco's argument, in support of its pending motion, is that the implementation of Toolco's control over the acquisition of aircraft for TWA's use did not constitute self dealing under the test set forth in *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717 (1971), and that, therefore, there is no basis for the application of the intrinsic fairness rule to the facts in issue. Toolco specifically contends that there is no transaction here involved, not approved by the CAB, which occurred during the period which is the subject matter of this litigation as a result of which Toolco received a benefit to the detriment of TWA and its minority shareholders.

The intrinsic fairness test is to be applied in situations in which the fiduciary duty existing between a parent and a dominated subsidiary is accompanied by self dealing, the nature of self dealing be defined by the Supreme Court of Delaware in *Sinclair Oil Corp. v. Levien,* supra as follows:

> "Self dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in which a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary."

In the case at bar it is conceded that the defendants exercised domination and control over TWA for their own benefit and interests and without regard for the interests of TWA, it being conceded that they took over from TWA what would otherwise have been its right to arrange for the purchase of and to finance the acquisition of its own jet aircraft, by making decisions for TWA on the choice of aircraft and their suppliers.

proposition that a parent corporation owning less than all of its subsidiary's stock may so use such a subsidiary as a captive market.

One of the purposes of the defendants in pursuing such course of conduct was to cause Toolco to become a major supplier of jet aircraft to TWA and other competing air carriers. Furthermore, sales and leases of aircraft by Toolco to TWA were arranged so as to maintain high profits for the former. For example, the lease plan, as initially drawn, was not considered to be profitable enough to the defendants and was accordingly abandoned. In fact, defendants' purpose that the plan for overall financing should provide substantial profits for Toolco on a capital gain basis and also preserve for such corporation other tax advantages derived from ownership of the aircraft was the principal obstacle to the adoption of a financing plan acceptable to lending institutions as fair to the minority interests of TWA, because by preventing TWA from negotiating for the acquisition of needed jet planes on terms more favorable to such corporation and its minority shareholders, the minority stockholders of TWA were damaged. *Sinclair Oil Corp. v. Levien,* supra, does not support the

Were the contentions of the defendants to be accorded validity, a parent corporation would be free to treat a subsidiary as a captive market, selecting its own time to change such arrangement, just so long as the terms of sales to such a subsidiary were ultimately to be found to be fair. Such a perversion of corporate law, if condoned, would expose minority stockholders to substantial interim injury with no offsetting benefits. I conclude that that test of intrinsic fairness is the proper standard to be applied here.

Toolco also contends that this Court's opinion of March 25, 1977 fails to give any effect to the orders of the CAB which authorized the defendants to employ the controls which Toolco exercised over TWA's equipment needs, the reference evidently being made to the CAB opinions and orders

which approved the acquisition by Toolco of TWA.[1] Toolco argues that the Supreme Court of the United States has held that the kind of control which Toolco exercised over TWA was precisely that which the CAB authorized.[2]

■ Although the cited opinions of the CAB approved control of TWA by Toolco, this does not mean, in my opinion, that every act or means utilized by Toolco in the exercise of such control was thereby immunized from attack. Were that so, CAB approval constituted a blanket of immunity, a conclusion which has already been explicitly rejected by the Supreme Court of Delaware as follows:

"We deal here with an intra-corporate conflict. The claims are large, the events are dated and complex; but in essence, the contest simply invokes standards of conduct applicable to corporate fiduciaries and litigated over the years in Delaware Courts. Nothing has been called to our attention which persuades us that the Congress intended to preempt State power to regulate such conduct (as part of our "housekeeping" function, if nothing more) and vest it in the CAB. What remedies would the Board provide? What judgments would it render? What protection would it accord to minority stockholders, and by what process?

"The short of it is that the CAB's basic mission and competency is, as Chief Justice Burger emphasized in his dissent in Hughes Tool, supra, the regulation of entry into and competition within the air transportation industry. There has been here no showing that any general Federal purpose is vested in the CAB to preempt state regulation of the intra-corporate affairs of those subject to CAB jurisdiction for airline regulation purposes."

Hughes v. Trans World Airlines, Inc., Del. Supr., 336 A.2d 572, 579 (1975).

Neither of the opinions of the CAB which approved of control of Toolco by TWA purported to authorize Toolco's use of TWA as a captive market and the later opinion of the CAB which approved the financing plan which was ultimately consummated expressed the view that Toolco's control of TWA, as exercised through Hughes, presented substantial problems, indicating that reacquisition by Toolco of control of TWA, following termination of the voting trust, would not be forthcoming without a searching inquiry into the public interest factor affecting such control.[3] In so ruling, the Board made reference to the delays encountered by TWA in the financing of the purchase of and delivery of its essential jet planes. It would thus appear that in the Board's view Toolco's actions exceeded the scope of that approved in the earlier orders.

In my opinion, the March 25, 1977 opinion of this Court did not fail to consider or to give effect to either the decision of the Supreme Court of Delaware in Sinclair Oil Corp. v. Levien or to the orders of the CAB. The corporate defendant's motion for reargument is denied.

If opposing counsel cannot agree on a form of final order, separate forms should be submitted.

---

1. See 6 C.A.B. 153 (1944); 12 C.A.B. 192 (1950).

2. See Hughes Tool Co. v. Trans World Airlines, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

3. See 32 C.A.B. 1363 (1960).