SUMMA CORPORATION and William R. Lummis, Delaware Ancillary Administrator of the Estate of Howard R. Hughes, Defendants Below, Appellants,

v.

TRANS WORLD AIRLINES, INC., Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Sept. 22, 1987.
Decided: April 4, 1988.
Rehearing Denied May 5, 1988.

Andrew B. Kirkpatrick, Jr. (argued), Martin P. Tully, Thomas Reed Hunt, Jr., and Edmond D. Johnson, of Morris, Nichols, Arsht & Tunnell, David A. Jenkins, of Lassen, Smith, Katzenstein & Furlow, Wilmington, for appellants.

Louis J. Finger and Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, William E. Hegarty (argued), Dudley B. Tenney, Marshall Cox, Michael P. Tierney, and Dierdre A. Burgman, of Cahill, Gordon & Reindel, New York City, of counsel, for appellee.

Before CHRISTIE, C.J., and HORSEY and MOORE, JJ.

MOORE, Justice.

This accounting action has consumed more than twenty-five years of litigation between Trans World Airlines, Inc. ("TWA"), and the late Howard R. Hughes and his wholly owned enterprise, Hughes Tool Company ("Toolco").[1] In length of time, although certainly not in other respects, it may almost seem reminiscent of *Jarndyce* and *Jarndyce*.[2] The end, however, is in sight.

In 1962 TWA sued Hughes and Toolco in the Court of Chancery alleging that the defendants had breached their fiduciary duty of loyalty by deliberately interfering with TWA's commercial success to benefit themselves. After trial the Court of Chancery assessed damages plus interest of $48,349,022.48 against Toolco. The defendants challenge several aspects of the award, and the plaintiff appeals the calculation of post-judgment interest.

We find no error in the trial court's calculation of damages and interest. Accordingly, we affirm.

## I.

The background of this case has been developed in earlier court opinions. *See Trans World Airlines, Inc. v. State ex rel. Porterie*, 54 Del. 582, 183 A.2d 174 (1962); *Trans World Airlines, Inc. v. Hughes*, 40 Del.Ch. 523, 185 A.2d 762 (1962); *Hughes v. Trans World Airlines, Inc.*, 40 Del.Ch. 552, 185 A.2d 886 (1962); *Trans World Airlines, Inc. v. Hughes Tool Co.*, 41 Del.Ch. 11, 187 A.2d 350 (1962); *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Trans World Airlines, Inc. v. Hughes*, Del.Ch., 317 A.2d 114 (1974); *Hughes v. Trans World Airlines, Inc.*, Del. Supr., 336 A.2d 572 (1975); *Trans World Airlines, Inc. v. Summa Corp.*, Del.Ch., 374 A.2d 5 (1977). We review only those facts now essential to our decision.

In 1939 Howard R. Hughes, through Toolco, began acquiring stock in TWA. In 1942 Toolco had working control of TWA,

---

1. Summa Corporation, the named defendant, is the successor in interest to Toolco. William R. Lummis is the Delaware ancillary administrator of the estate of Howard R. Hughes. For purposes of convenience we will refer to both defendants as "Toolco".

2. The fabled and interminable litigation described in C. Dickens, Bleak House (C. Dickens ed. 1868).

owning 40% of its common stock. By 1958, Toolco had increased its holdings to 78%, and exercised control over TWA's day-to-day operations. Because Toolco was engaged in experimentation in aviation, and in the manufacture of airplane parts for the military services, its interest in TWA was closely scrutinized by the Civil Aeronautics Board ("CAB"). Pursuant to the Federal Aviation Act, 49 U.S.C. § 1301 et seq. (1982), ("FAA"), the CAB was empowered to regulate the sale, control, or other acquisition of an air carrier by "any person engaged in any other phase of aeronautics." Thus, all transactions which were likely to affect the nature of TWA's control by Toolco were subject to CAB approval.

Between 1950 and 1960 Toolco used its control position to TWA's detriment. Because of Hughes' evasive nature and difficult temperament, Toolco was slow to order the then novel jet airplanes which TWA needed to remain competitive. Toolco refused to allow TWA to purchase its own aircraft, preferring instead to buy the planes and sell or lease them to TWA at a profit. Several of the planes ordered for TWA, once delivered, were diverted to other airlines. Some planes never arrived due to Toolco's deliberate efforts to delay or stop their production. Many of those actions were designed to minimize both Hughes' and Toolco's tax exposure, but they also resulted in losses of profits to TWA.

In 1960, pursuant to a financing agreement between TWA and several banks, Toolco was forced to place its TWA stock in a voting trust controlled by the banks. Soon thereafter, in 1961 TWA sued Toolco in the United States District Court for the Southern District of New York (the federal action), alleging that Toolco had violated federal antitrust laws by refusing to allow TWA to purchase aircraft from other suppliers. In 1962, TWA brought the present suit in the Court of Chancery, alleging that Toolco breached its fiduciary duty by engaging in transactions tainted by self-interest. However, this case remained dormant pending the outcome of the federal action, which was concluded in 1973 when the United States Supreme Court rejected TWA's federal antitrust claims. See Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

Thereafter, Toolco revived the present action by promptly moving for summary judgment, based upon res judicata grounds, arguing that under the Federal Aviation Act the Supreme Court of the United States' decision in the federal action rendered Toolco's transactions immune from all laws, including the fiduciary principles of Delaware corporate law. This Court rejected that contention, and held that under the United States Supreme Court's decision only those transactions which were specifically approved by the CAB were immune from all other restraints imposed by law. Hughes v. Trans World Airlines, Inc., Del.Supr., 336 A.2d 572 (1975). Toolco then filed an answer admitting the well pleaded allegations of the complaint.

Both Toolco and TWA moved for summary judgment. Defendants again claimed transactional immunity on the theory that the damages which TWA sought arose out of the transactions approved by the CAB. The Court of Chancery rejected this defense. While the defendants were not required to account for profits realized in connection with the CAB approved acts, they were liable to TWA because there had been "no general approval by the Civil Aeronautics Board of the overall conduct of the defendants vis a vis plaintiff." Trans World Airlines, Inc. v. Summa Corp., Del.Ch., 374 A.2d 5, 12 (1977).

Applying the intrinsic fairness test, the court granted partial summary judgment to TWA and ordered an accounting, holding that Toolco had not met its burden respecting the fairness of the transactions. See Sinclair Oil Corp. v. Levien, Del.Supr., 280 A.2d 717 (1971). However, the court denied TWA's claim that Toolco was liable for damages resulting from the sale or lease of airplanes to air carriers other than TWA, because TWA had failed to show that Toolco had derived a benefit which was detrimental to TWA. See Summa, 374 A.2d at 10, 12.

The trial court recognized that Toolco could not be held accountable for profits realized from transactions specifically approved by the CAB, but ruled that if the transactions were part of an "overall control pattern" which harmed TWA, the latter was entitled to damages for such conduct. The court delineated five areas of control in which Toolco was subject to liability if damages were proven.

After nearly ten years of discovery, and trial on the issue of damages, the Court of Chancery awarded TWA $17,238,366 plus pre-judgment interest of $31,108,234. Post-judgment interest was allowed only on the damage award.

Toolco's appeal raises four issues. First, it reurges the transactional immunity defense which both this Court and the Court of Chancery have previously rejected. Second, Toolco argues that its failure to place an earlier order for Boeing jets was not a breach of its fiduciary duty to TWA because TWA did not need that type of jet. Third, Toolco disputes the inclusion in the damage calculation of accounting changes made by TWA in late 1963. Finally, Toolco argues that the use of an interest rate in excess of the legal rate was erroneous. TWA has cross appealed the calculation of post-judgment interest, contending that it should be based upon both the damage and pre-judgment interest awards.

## II.

The Federal Aviation Act, 49 U.S.C. § 1301 (1982) created the Civil Aeronautics Board to oversee and regulate the rapidly expanding airline industry. Pursuant to this authority the CAB could exempt transactions which were otherwise subject to antitrust or other laws. Thus § 414 of the FAA, 49 U.S.C. § 1384, provides:

> Any person affected by any order made under sections 1378, 1379 or 1382 of this title shall be, and is hereby, relieved from the operations of the "antitrust laws", as designated in section 12 of title 15, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order.

Because the sales and leases of airplanes between Toolco and TWA were approved by the CAB, the Supreme Court of the United States decided in the federal action that those transactions were exempt from the antitrust laws and "all other restraints or prohibitions made by, or imposed under, authority of law." However, as this Court held in *Hughes v. Trans World Airlines*, Del.Supr., 336 A.2d 572, 579 (1975), that did not confer a "blanket immunity" upon the actions of Toolco. Although specific transactions were immunized by CAB authority, Toolco's conduct which was not the subject of CAB review or approval, when taken as a whole, could involve violations of its fiduciary duties to TWA under Delaware law. The Court of Chancery later found such violations to the rights of the TWA minority.

Although Toolco was not held accountable for profits resulting from the specific transactions approved by the CAB, TWA claimed a loss of profits resulting from Toolco's inaction, rather than its actions. Thus, by failing to purchase jets in the early 1950's Toolco denied TWA the opportunity to be competitive and profitable. Moreover, Toolco's general conduct was actionable. By leasing planes to TWA, rather than selling them, and by selling planes to TWA only at a profit, Toolco had denied TWA the control required to be competitive in the airline industry. The CAB did not consider or approve any of those matters. As a whole, Toolco acted for its sole benefit at the expense of its fiduciary duties to TWA's minority shareholders. Merely because certain specific transactions were immunized by CAB approval did not relieve Toolco of its general fiduciary duties of loyalty and care.

## III.

It is well established in Delaware that one who stands on both sides of a transaction has the burden of proving its entire fairness. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983); *Sterling v. Mayflower Hotel Corp.*, Del.Supr.,

33 Del.Ch. 293, 93 A.2d 107, 110 (1952). In the absence of arms length bargaining, clearly the situation here, this obligation inheres in, and invariably arises from the parent-subsidiary relationship. *Weinberger v. UOP, Inc.*, at 709, n. 7, 709–710; *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937–38 (1985). This rule applies when "the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to the minority stockholders of the subsidiary." *Sinclair Oil*, 280 A.2d at 720.

■ Toolco was a 78% shareholder in TWA, and, exerting its control position, Toolco refused to allow TWA to purchase its own jets, delayed the production of jets which were ordered, unjustifiably rejected acceptable aircraft, forced TWA to enter into leases for aircraft, and sold airplanes to TWA at a profit—all to Toolco's benefit, but materially detrimental to the productivity and effectiveness of TWA. By fixing the terms of the leases and sales to TWA, Toolco thereby accrued substantial profits, reportable as capital gains, as well as other tax benefits. Furthermore, Toolco structured the transactions to minimize its exposure to risk at the expense of TWA's profits. Such conduct hardly comports with basic concepts of fair dealing under the fiduciary standards of Delaware corporation law.

Toolco's defense is essentially one of minimizing its actions. For example, it argues that TWA had no need for a full fleet of certain jet aircraft in 1955 because those planes did not have non-stop transatlantic capability. Thus, Toolco contends, it should not be held accountable for TWA's lost profits due to Toolco's failure to order such aircraft.

However, this argument, like Toolco's others, ignores the fact that the intrinsic fairness test placed the burden upon Toolco to prove that it was not the cause of TWA's lost profits. It could have done so by showing that the outcome of the transaction, had it been approved by an independent board of directors, would have been the same. The trial court found, and we agree, that Toolco failed to meet that burden.

Mr. Robert W. Rummel, a longtime employee of Toolco and TWA, testified that Hughes would not allow him to negotiate with one aircraft manufacturer because it refused to give Toolco the highest priority for delivery. The record also demonstrates that this manufacturer found Hughes to be a very difficult person. This adversely affected TWA because it caused Toolco to lose the little priority it did establish for delivery of the aircraft. Substantial evidence indicates that had Toolco been willing to negotiate, TWA would have had a delivery priority competitive with other airline companies. Toolco's argument that it was waiting for jets with true transatlantic capability is without merit. Other airlines, who were willing to negotiate with this particular manufacturer put the same planes to use on their transatlantic routes until the later models were available. When updated transatlantic jets were produced, the manufacturer negotiated with the airlines to "roll over" the earlier models for the later ones. Thus, for reasons clearly attributable to the eccentric or idiosyncratic business methods of Howard Hughes, TWA was unable to establish a jet fleet as quickly as its competitors. Given this record, it is manifest that no independent board of directors could have taken such action in good faith and in the honest belief that it was in the best interests of TWA. See *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). That point becomes even more apparent when one considers the application of the intrinsic fairness test here, and Toolco's failure to meet its burden of proof in that regard.

## IV.

The specific damage issues upon which the Court of Chancery focused at trial were:

1. Decreases in TWA's operating income for delayed delivery of Boeing jet aircraft.

2. Decreases in TWA's operating income for delayed delivery of Convair jet aircraft.

3. Decreases in TWA's operating income as a result of being limited to a smaller total fleet of jet aircraft.

4. Consequential damages, other than decreases in operating income, attributable to delayed delivery of Convair jet aircraft.

5. Increased expenses from being denied the right to acquire ownership of jet aircraft prior to December 30, 1960.

*Trans World Airlines, Inc. v. Summa Corp.*, Del.Ch., No. 1607 (March 12, 1985) (Letter Opinion) [Available on WESTLAW, 1985 WL 11544]. After trial the court held that Toolco had failed to meet its burden of demonstrating that it did not cause damages to TWA in each of the foregoing categories. *Trans World Airlines, Inc. v. Summa Corp.*, Del.Ch., No. 1607 (May 15, 1986) (Opinion) [Available on WESTLAW, 1986 WL 5671]. If the trial court's findings are sufficiently supported, as here, by the record and are the product of an orderly and logical deductive process, in the exercise of judicial restraint we accept them. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

A. *Delayed Delivery of Aircraft and the Resulting Smaller Fleet.*

■ The record fully supports the Court of Chancery's conclusion that Toolco delayed the growth of TWA's fleet of aircraft. Rummel testified that due to Howard Hughes' idiosyncratic temperament Toolco did not order planes for TWA until well after the other major airlines had done so. In late 1955 Toolco finally ordered eighteen Boeing 707–320's, fifteen Boeing 707–120's and thirty Convair CV–880's.

Of these sixty-three planes only forty-five were eventually delivered to TWA. This reduction in the size of the fleet was deliberately caused by Toolco, who placed its order late and failed to negotiate for priority, thus putting TWA behind all of its competitors on Boeing's delivery schedule. Before the Boeing aircraft were delivered, Toolco sold the rights to six of the planes to Pan Am because Toolco was unable to obtain the necessary financing. Toolco had consistently refused to allow TWA to purchase any of the planes directly, choosing instead to lease them to TWA on a day-to-day basis. As to the CV–880's, Toolco intentionally interfered with their production, causing substantial delays in delivery, and diverted six of the planes to Northeast Airlines. Toolco's actions resulted in TWA having a forty-five, rather than the intended fifty-two, plane fleet, all to TWA's substantial detriment.

The calculation of TWA's lost profits was the central issue at trial. To prove its damages TWA presented Edward L. Wemple, a transportation engineer and consultant, who testified regarding revenues and projected revenues at various times between 1956 and 1986. Much of Wemple's testimony regarding the probable success of TWA during the period at issue was corroborated by Rummel, the TWA–Toolco employee. These witnesses testified, based partially upon a 1959 report of Wemple's consulting firm, Coverdale & Colpitts, that TWA's passenger load factor would have increased substantially had TWA received delivery of all fifty-two jets.

In addition to testifying to the success of TWA in the airline industry generally, Wemple constructed a pro forma jet fleet which he used to calculate the net revenue effect of a smaller fleet. Based upon TWA's revenue and operating experience in the subject years, Wemple calculated the loss of profits due to the delay in delivery of the Boeings and Convair aircraft, and the loss due to the non-delivery of five Convair 880's. Wemple concluded that TWA suffered a loss of $33.9 million in revenue.

Finally, TWA called Joseph J. Rigney of Price, Waterhouse, an accounting firm, to reconstruct the financial records of TWA to determine the net effect on equity of the $33.9 million revenue loss. Using Wemple's figures and Rummel's operating expenses, as well as a pro forma financing plan presented by Dillon, Reed & Co., Inc., an investment banking firm, Rigney determined that the operation of a fifty-two plane fleet would have increased TWA's

equity by $16.7 million. Based upon a careful study of the facts and figures presented, and after assessing the credibility of each of the expert witnesses, the trial judge determined that Toolco caused this loss in equity. Given our scope and standard of review, *Levitt v. Bouvier*, 287 A.2d at 673, the trial court's decision is fully supported by the record, and we accept its findings.

Toolco argues that the damages are inflated by $5.8 million because Rigney of Price, Waterhouse included in his calculation certain accounting changes made in the last quarter of 1963. Before 1963 TWA charged overhaul expenses to a reserve on the basis of the number of hours flown. In 1963 TWA began charging the overhaul expenses as operating costs. This eliminated the overhaul reserve and created additional equity. Toolco objects to Rigney's inclusion of this sum in his damage calculations.

The trial judge was satisfied that the use of this increased equity in calculating the damages was appropriate. We agree. The damage period selected by the court extended to the end of 1963. The selection of a 5¼ year damage period is supported by substantial evidence, and there was no error or abuse of discretion by the inclusion of the accounting changes in calculating damages through 1963.

### B. *Disruption of Business.*

■ Because the CV–880's were delivered late, TWA had to pay idle flight crews, and once the CV–880's were delivered, TWA was forced to provide refresher training courses for both flight and ground crews. The trial judge concluded, based upon competent evidence, that TWA suffered a loss of $538,366. Again, the record fully supports that ruling.

### V.

In calculating the pre-judgment interest the trial court used a rate of 7.32% based on the average of the legal rate of interest, 6%, and the composite interest rate for TWA's historic cost of borrowing, 8.64%. This rate of 7.32% was applied to the dam-

age award over a 27 year period from 1960 until 1986, resulting in pre-judgment interest of $31,108,234. *Trans World Airlines, Inc. v. Summa Corporation*, Del.Ch., No. 1607 (January 21, 1987) (Opinion on Interest) [Available on WESTLAW, 1987 WL 5778].

■ Toolco argues that the trial court erred by using a rate other than the legal interest rate, and by including in the pre-judgment interest calculation the period during which the case lay dormant. While the legal rate of interest has historically been the benchmark for pre-judgment interest, *Rollins Envtl. Serv., Inc. v. WSMW Indus.*, Del.Supr., 426 A.2d 1363, 1366 (1980), a court of equity has broad discretion, subject to principles of fairness, in fixing the rate to be applied. *Lynch v. Vickers Energy Corp.*, Del.Supr., 429 A.2d 497, 506 (1981); *Sinclair Oil Corp.. v. Levien*, Del.Supr., 332 A.2d 139 (1975). In the Court of Chancery the legal rate is a mere guide, not an inflexible rule. *Missouri–Kansas Pipeline Co. v. Warrick*, 25 Del.Ch. 388, 22 A.2d 865, 868 (1941).

■ In selecting the interest rate the trial court considered the nature of the plaintiff, the nature of the wrong to be remedied, and the peculiar facts of the case. Each of those factors was appropriate, and there was no abuse of discretion in the court's choice of rate.

■ Nor did the court abuse its discretion in including the years of 1962–1973 as part of the pre-judgment interest calculation. A successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues. *Metropolitan Mut. Fire Ins. Co. v. Carmen Holding Co.*, Del.Supr., 220 A.2d 778, 781–82 (1966). However, a court may, in its discretion, deny a plaintiff interest if he delayed prosecution of his claim. *Moskowitz v. Mayor of Wilmington*, Del.Supr., 391 A.2d 209, 211 (1978); *Maryland Casualty Co. v. Hanby*, Del.Supr., 301 A.2d 286, 288 (1973). The trial court found that the ten year delay was due to the nature and tactics of the defendant, Howard Hughes, and to acquiescence by both parties. The plain-

tiffs did not unilaterally delay the litigation.

## VI.

■ Finally, TWA's cross-appeal seeks to have post-judgment interest calculated upon both the damage award and pre-judgment interest. TWA cites no Delaware authority for its position. In *Francis I. duPont & Co. v. Universal City Studios, Inc.*, Del.Ch., 343 A.2d 629 (1975), the court specifically refused to apply post-judgment interest to an award of pre-judgment interest. The Delaware courts have traditionally disfavored the practice of compounding interest, and we see no reason to depart from that rule here. Thus, TWA's cross claim is without merit.

The judgment of the Court of Chancery is AFFIRMED.