**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2800

_____

PHARMACY CORPORATION OF AMERICA

v.

KAVEH ASKARI; ONCO360 HOLDINGS 1, INC.; ONCO360 HOLDINGS 2, INC.;
ONCO360 HOLDINGS 3, INC.,

Appellants

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:16-cv-01123)
U.S. District Judge: Honorable Richard G. Andrews

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on June 24, 2022

Before: McKEE, RESTREPO, and BIBAS, *Circuit Judges*

(Filed August 26, 2022)

_____

OPINION*

_____

BIBAS, *Circuit Judge*.

When someone starts a company, it can be painful to sell it. But without more, seller's

remorse does not amount to a breach of contract. Kaveh Askari has nothing else here. He

_____

* This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding
precedent.

sold his company in a complex deal and now wishes that he had made more money. But he cannot show that the buyer broke any part of the deal. So we will affirm his loss at trial.

## I. BACKGROUND

### A. The deal

Askari started a small cancer pharmacy, OncoMed Pharmaceutical Services. He dreamed of expanding it but lacked the know-how and cash. So he started looking for someone who could both buy the company and take it nationwide. PharMerica fit the bill: it was a public company with money and experience. So Askari agreed to sell it OncoMed in a three-step deal.

The first step set the stage for PharMerica to run the business. PharMerica would buy a minority stake in OncoMed. It would also give OncoMed a $10 million line of credit for "Working Capital," which OncoMed would draw down as needed. App. 1688. In return, PharMerica would get to install new leaders to run OncoMed. Askari would no longer get a say, except for a vote on a list of "Major Decisions."

The next two steps took care of the rest of the sale. Three years down the road, PharMerica would have an option to buy a bigger stake in OncoMed at a price set by an agreed-upon formula. That formula would be based on the money OncoMed had made (its earnings) minus the money it owed (its debt). Two years after that, the third step kicked in, and PharMerica was required to buy the rest of OncoMed according to the same price formula.

In PharMerica's eyes, things went as planned. Its cash injections worked and OncoMed grew. Pleased, the new leaders wanted to follow a business strategy that required more

cash. So PharMerica increased the Working Capital line of credit twice, from $10 million to $30 million, then again to $64 million. Around rolled the window for PharMerica's option to buy more of the company, and it took the leap. It got a great deal: OncoMed still had more debt than income, so the formula yielded a token price of $1. But Askari's payday still came. At the third step, as agreed, PharMerica bought the rest of OncoMed. By then, the company was thriving, and Askari cashed out for almost $20 million.

But Askari wanted more. He suspected that PharMerica had gotten its math wrong and underpaid him. So he sued PharMerica for breach of contract.

## B. The lawsuit

To understand Askari's suit, we start with OncoMed's price formula. In financial jargon, the parties agreed that PharMerica would pay Askari:

> an amount equal to (A)(i) the product of (x) the trailing twelve (12) months of EBITDA and (y) the Valuation Multiplier, less (ii) the Net Debt of the Company, less (iii) the purchase price for any acquisition of assets, business or Person by the Company, unless such amount is included in the calculation of Net Debt, multiplied by (B) the Percentage Interests of the Company being purchased.

App. 1610 §9.2(a). In essence, PharMerica promised to pay Askari his share of an amount based on OncoMed's last year of earnings minus its debt. Askari's share would be based on how much of OncoMed he owned.

Now consider Askari's grievance. At trial, he claimed that PharMerica had fudged its math on both sides of the equation and thus underpaid him. He said that PharMerica had downplayed part of OncoMed's earnings. And he thought that PharMerica had inflated OncoMed's debt by wrongfully increasing its line of credit twice. Those credit changes, he

3

argued, were "Major Decision[s]" that required his consent. And because he never consented, they were supposedly void and should not have reduced the price.

Both theories fell flat at a bench trial, and PharMerica won. Now Askari appeals. We review the trial court's fact findings for clear error and its legal conclusions de novo. *Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.*, 855 F.3d 163, 169–70 (3d Cir. 2017).

## II. ASKARI RIGHTLY BORE THE BURDEN OF PROOF

Askari tries to overturn his loss in a few ways. First, he attacks the burden of proof. The District Court should have put it on PharMerica, he says, not on him.

Normally, the plaintiff bears the burden of proof. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 102 (3d Cir. 2001). Yet Askari thinks he can escape that rule. Because PharMerica managed OncoMed, he says, it "was on both sides" of the transactions to buy OncoMed and lend it money. Appellant's Br. 44. So under Delaware law, PharMerica should have borne the burden of proving the deal's "entire fairness." *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 406 (Del. 1988).

We disagree. For one thing, Askari forfeited this argument. Though he raised it in an evidentiary motion, the court dismissed it as "premature," and he did not flag it again at trial. App. 377, 431:14-22. So he did not preserve the issue. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1174 (3d Cir. 1993).

Besides, even if his argument had been timely, he would still lose. The entire-fairness doctrine seems to cover only claims involving fiduciaries. *See, e.g.*, *Summa*, 540 A.2d at 406; *cf. Bohler-Uddeholm*, 247 F.3d at 102 ("[I]t is hornbook law that (when no fiduciary

4

relationship exists) the party alleging a breach of contract bears the burden of proving" it).

Askari's contract with PharMerica expressly disclaimed all fiduciary duties. He does not identify any case law applying entire fairness to claims like his, nor can we find any. So he cannot shake the default rule and rightly bore the burden of proof.

### III. THE DISTRICT COURT DID NOT CLEARLY ERR IN ANALYZING THE DEAL

On the merits, Askari presses two issues. First, he challenges PharMerica's debt calculations. He says that when the District Court found no breach, it overlooked facts in the record. Next, he quibbles with how PharMerica exercised its option at step two of the deal. The District Court did not address this issue, which he says was a reversible error. Neither tack pays off.

### A. Askari cannot show that PharMerica inflated OncoMed's debt

OncoMed was priced by its earnings minus its debt. On appeal, Askari trains his fire only on the debt. He thinks PharMerica inflated that debt with invalid loans: the two credit-line increases. They were invalid, he says, because both were "Major Decision[s]" that required but never got his approval. Appellant's Br. 30. The District Court was not convinced. Nor are we.

We start with the text of the contract. The parties agreed that Askari "shall have no right to participate in the management of [OncoMed]" except for a vote on any of five enumerated "Major Decisions." App. 1652 § 5.8. He alleges that the credit-line increases fell within the second category of Major Decisions: those that "caus[e] … the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar

5

encumbrance on all or any substantial portion of [OncoMed's] assets … except as contemplated by the [first Working-Capital agreement]." *Id.* §5.8(b).

But the credit-line increases did not create a lien. Askari got a say only on the "granting or incurrence" of a security interest—creating a new encumbrance, not changing an existing one. *Id.* Yet neither of the two line-of-credit increases created a new claim against OncoMed's assets. Plus, PharMerica already had a "security interest in and lien upon *all of* [OncoMed's] existing *and after-acquired* personal and real property" from the first $10 million line of credit. App. 1686 (emphases added). Both times when it increased the credit limit, it otherwise left that first contract alone.

Still, Askari argues, increasing the credit limit must have increased the value of that original lien. Maybe so. But mere changes in the amount of a lien do not sound like the "granting or incurrence" of a lien. App. 1652 § 5.8(b)(B); *see also Mann v. Chase Manhattan Mortg. Corp.*, 316 F.3d 1, 4 (3d Cir. 2003).

Besides, even if the increases had granted a new lien, Askari still could not have voted on them. They were carved out of the list of Major Decisions because they were "contemplated by the [first line of credit]." App. 1652 §5.8(b)(B). That is because the first line of credit anticipated later changes. *See, e.g.*, App. 1686 (discussing "[t]his Loan agreement (as amended … supplemented or otherwise modified)"); App. 1693 §2.8(c) (letting PharMerica "change the terms relating to the [o]bligations" "with the written agreement of [*OncoMed*]," not Askari). Those changes could include the credit limit.

At most, that language is ambiguous, so we could look beyond the text. *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 A.3d 204, 210 (3d Cir. 2005). Still, the parties' conduct confirms

6

this reading. Both times, when PharMerica mentioned increasing the line of credit, Askari criticized that plan, but never called the increases Major Decisions or invoked that provision. So all Askari has is his own word at trial. Yet the court did not believe his efforts to reframe those criticisms as an "object[ion]" under the Major Decisions provision. App. 680:12. Because there is no other evidence to the contrary, we defer to that credibility finding. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). Resisting this outcome, Askari then challenges the District Court's supposed finding that he "consented to the amendments." Appellant's Br. 34. But the court never made that finding. App. 8 n.2.

So Askari pivots, offering yet another theory. The changes were "Major Decisions," he says, because they contradict a key purpose elsewhere in the parties' deal. Askari says that the $10 million credit limit "was an important provision intended to protect [him]—not [PharMerica]." Appellant's Br. 29. That credit limit was not a floor but a ceiling to keep PharMerica from "load[ing] debt on [OncoMed]" to artificially depress its price. *Id.*

Yet the deal's language belies his claim. Even if the credit limit protected Askari, that general purpose does not bear on the specific Major Decisions provision. That provision expressly lists the five events on which he can vote. It does not mention a $10 million cap, let alone the line of credit. Plus, the definition of the debt variable in OncoMed's price formula had no cap either. If that limit had been so central to the deal, then the parties would have negotiated it outright.

Askari does not show that these loans were "Major Decisions" under any other theory. The provision's text is clear and unambiguous, requiring his consent only for the five listed

events. Raising the credit limit is not one of them. His efforts to expand that list are unavailing.

**B. Nor was there clear error in the payment procedure**

Askari turns next to procedure. If PharMerica opted to buy more of OncoMed midway through the project, the parties agreed that "[Askari] shall execute and deliver to [PharMerica] such instruments as may be necessary to transfer title." App. 1663. Askari never did that. So, he says, PharMerica's option was procedurally void, meaning it still had to pay for those shares at the end of the deal.

But this theory fails too. PharMerica had a call option: "the right" to buy part of OncoMed midway through its three-step purchase of the company. App. 1662 §9.1. An option means that Askari had made "a continuing offer to sell" that PharMerica could accept by giving "notice of the election to purchase." *Glenn v. Tide Water Assoc. Oil Co.*, 101 A.2d 339, 343 (Del. Ch. 1953). Once PharMerica gave notice, the contract was formed, and both parties were bound. *See* 1 *Williston on Contracts* §5:16 (4th ed. 1993); *Walsh v. White House Post Prods., LLC*, 2020 WL 1492543, at *6 (Del. Ch. Mar. 25, 2020). Askari could not change that by refusing to do *his* part.

Pushing back, Askari insists that a valid option requires "[p]recise compliance with the terms" of the option. Appellant's Br. 38. True enough. But this "strict adherence" applies to PharMerica's *accepting* the continuing offer, not Askari's *conduct afterward*. *See Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *28, 30–31 (Del. Ch. Mar. 30, 2017) ("[C]ourts … construe the attempt to accept the terms offered under the option strictly." (internal quotation marks omitted)). And PharMerica accepted

8

the offer. Askari's failure to follow through afterward cannot change that. Nor do his overtures to doctrines against self-help apply here.

Besides, Askari forfeited this theory. He never pleaded it in his complaint, raising it for the first time at the close of trial. So the District Court did not address it and did not have to. *See Ely v. Reading Co.*, 424 F.2d 758, 763 (3d Cir. 1970) (scope of pretrial order is "binding" on the parties).

### III. NEITHER EVIDENTIARY RULING WAS AN ABUSE OF DISCRETION

Last, Askari claims that the District Court got two evidentiary rulings wrong: granting a motion in limine and admitting PharMerica's expert testimony. Yet neither was an abuse of discretion.

### A. Granting PharMerica's motion in limine was reasonable

Askari's complaint alleged two breach-of-contract theories: PharMerica had made a mistake on the earnings side of its price formula and another mistake on the debt side. But in his pretrial briefing, he tried to tack on new theories. PharMerica moved in limine to exclude them, objecting that they were not in the complaint. The District Court granted that motion. Upset, Askari says this ruling unduly limited the scope of trial. Not so.

We review such evidentiary rulings for abuse of discretion. *United States v. Starnes*, 583 F.3d 196, 213–14 (3d Cir. 2009). So we will affirm unless the ruling is "arbitrary, fanciful or clearly unreasonable." *Id.* at 214 (internal quotation marks omitted).

Because Askari's last-minute theories were not in his complaint, the trial court reasonably excluded them. First, Askari lobbed a new charge of miscalculation. For instance, he said that PharMerica had impermissibly included intercompany liabilities in

9

its debt calculations. Then, he said it had fudged its math by using "conflicting numbers" for those liabilities. Appellant's Br. 49. These alleged errors were different from the ones in his complaint.

Askari then alleged that the credit-limit increases were invalid because they violated another part of the parties' contract, the "Related-Party Transaction" provision. Appellant's Br. 32–33. Yet that was not in the complaint either. The complaint's only reference to this concept is a block quotation including that provision as part of an unrelated discussion. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 499 n.1 (3d Cir. 1997) (declining to read in another cause of action despite "a brief reference" in "the complaint's background section"). So the District Court acted well within its discretion by excluding Askari's new theories from trial.

Maybe so, Askari says, but the District Court should have let him add these theories to his complaint. Yet that denial was not an abuse of discretion either. *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002). For one, Askari never formally moved to amend his complaint, as required by the local rules. *See* D. Del. Local Rule 15.1. That oversight alone can bar amendment. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007). And even if we were to treat Askari's belated request, tucked into a motion to reargue a motion in limine, as a formal motion to amend, he gave no good cause for his delay. *See Premier Comp. Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020).

## B. Admitting PharMerica's expert testimony was reasonable too

The District Court admitted expert testimony from PharMerica's Dr. Richard Mortimer. Askari objected to its relevance and reliability. Though he framed it as a motion in limine, it read much like a *Daubert* motion. Either way, the District Court did not abuse its discretion by admitting the testimony. *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1213 (3d Cir. 1995).

First, Askari forfeited any relevance objection to the testimony. He lost his motion in limine and did not object again until after trial. An objection raised before trial is preserved without further objection only if the trial court denies the motion "with no suggestion that it would reconsider [it] at trial." *United States v. Polishan*, 336 F.3d 234, 244 (3d Cir. 2003) (internal quotation marks omitted). Yet when the District Court denied Askari's pretrial motion, it said he could try again later. He did not, so he forfeited his objection.

Askari also forfeited any *Daubert* objection to the expert's qualifications. *See, e.g.*, *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289–90 (10th Cir. 2000). The court set a deadline for *Daubert* motions, but he missed it. So if it was a *Daubert* motion, the District Court reasonably denied it as too late.

Besides, Dr. Mortimer's relevant and reliable testimony would have survived a timely objection. It directly refuted one of Askari's key allegations. Askari charged that PharMerica had increased its line of credit to OncoMed "without any legitimate business purpose [only to] driv[e] up [its debt]" and "dr[i]ve down the purchase price" for OncoMed. App. 83. But Dr. Mortimer's report showed otherwise: It found that the cash had enabled

11

a new business strategy that led to even higher revenue and thus a higher price for Askari. And it also rebutted Askari's argument that PharMerica had acted in bad faith.

Pushing back, Askari objects that not *all* the line of credit went to that business strategy, so Dr. Mortimer's testimony was unfounded. No matter. Dr. Mortimer testified that the line of credit "help[ed] fund [that] strategy," not that every penny went towards it. App. 1196. Askari cites no other evidence that Dr. Mortimer's testimony is unsupported by the record.

Nor does Askari make any other plausible argument that Dr. Mortimer's testimony was unreliable. To the contrary, the record corroborated his testimony. So we defer to the District Court's decision to admit it. *See United States v. Mitchell*, 365 F.3d 215, 233-34 (3d Cir. 2004) (affording liberal deference to "evidentiary rulings [even if] made on-the-fly and without written findings of fact").

\* \* \* \* \*

What once seemed like a good deal may sour with time. But regret alone does not a viable claim make. Because Askari showed no breach of contract, the District Court properly ruled against him. So we will affirm.

12